IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TIMOTHY D. BYRD, | CASE NO. 3:22-cv-801 |
| Plaintiff, | DISTRICT JUDGE<br>JAMES R. KNEPP II |
| vs. | MAGISTRATE JUDGE<br>JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT &<br>RECOMMENDATION** |

Plaintiff Timothy Byrd filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

**Procedural history**

In October 2019, Byrd filed an application for Supplemental Security Income alleging a disability onset date of August 12, 2019,[1] and claiming he

---

[1] "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

was disabled due to mental problems, hearing loss, degenerative spine disease, arthritis in his knees, hips, and spine, headaches, high cholesterol, prostrate problems, depression, anxiety, and sleep problems. Tr. 967, 969, 991. The Social Security Administration denied Byrd's application and his motion for reconsideration. Tr. 892–93. Byrd then requested a hearing before an Administrative Law Judge (ALJ). Tr. 918.

In December 2020, an ALJ held a hearing. Byrd and a vocational expert testified. Tr. 814–44. The next month, the ALJ issued a written decision finding that Byrd was not disabled. Tr. 11–30. The ALJ's decision became final on March 18, 2022, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Byrd filed this action on May 17, 2022. Doc. 1. He asserts the following assignment of error:

> The ALJ erred in determining that Mr. Byrd's headaches were not a medically determinable impairment.

Doc. 7, at 2.

**Evidence**

*1. Personal and vocational evidence*

Byrd was born in 1977 and was 42 years old on the day he filed his application Tr. 28. He finished eleventh grade and used to work in a recycling plant and as a parts laborer. Tr. 822–24, 835.

*2. Medical evidence*[2]

A printout from one of Byrd's visits to a neurology office lists various "patient problems" spanning 3 years and shows that Byrd had a brain MRI in July 2018 that was "abnormal." Tr. 2640.

In January 2019, Byrd visited his neurologist's office for numbness and tingling in his head, face, and "upper extremity." Tr. 1886. Byrd said that he has headaches that "start[] posteriorly and move[] anteriorly to his temple." Tr. 1886–87. The treatment note described Byrd as a patient with "various, non-specific complaints," and an "extremely unreliable source of information, may have some cognitive delay." Tr. 1886. He "gives a vague description of his symptoms [and complains of] new symptoms that have not been mentioned before." Tr. 1886. Byrd "mentioned headaches at the end of his last visit, this was a completely new problem, he is still getting them." Tr. 1886. Byrd gave conflicting information about how long his headaches lasted and the note states, "Overall it is impossible to get any useful history from him." Tr. 1887. The treatment note includes summaries from Byrd's visits in 2018, in which Byrd's symptoms were "strongly suspect[ed]" to be of "psychogenic origin based

---

[2] The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. In his brief, Byrd's attorney cited the "Page ID" number instead of the Transcript number, in violation of the Court's Initial Order. *See* Doc. 4, at 3 ("citations to the Transcript should refer to the page number indicated on the lower right hand corner of the document, and NOT to the PageID # at the top of the document."). The next time counsel submits to me a brief with an incorrect citation format, I will strike it.

on negative imaging, lab results, and constant variations in his description of symptoms."[3] Tr. 2493. A remark from June 2018 raised the possibility that Byrd was "malingering." Tr. 2493.

A mid-January 2019 CTA scan of Byrd's head showed "no intracranial flow-limiting stenosis." Tr. 2031.

At an April 2019 neurological appointment, Byrd stated that he had headaches since 2010, when a barrel fell on his head at work. Tr. 2179, 2790. He had headaches 3 times a week. Tr. 2179. He didn't "take anything" for his headaches and was "able to function." Tr. 2179. He denied sensitivity to light or sound. Tr. 2179. Byrd stated that he was applying for disability due to "spine issues." Tr. 2180. The treatment note listed Byrd's assessed "Problems"—numbness, abnormal MRI of head, and "chronic tension-type headache, intractable." Tr. 2180, 2185. Byrd's headaches had a "strong cervicogenic component." Tr. 2185.

In July 2019, Byrd had a brain MRI due to his reports of "headaches x years," "pain right side of head x couple of years," facial numbness, lightheadedness, blurred vision, memory loss, and unsteadiness. Tr. 2394. The MRI showed multiple deep white matter changes in the periventricular

---

[3] Defendant writes that these descriptions of visits from 2018 refer to Byrd's headache complaints. Doc. 8, at 4. But the treatment note also references Byrd's arms, legs, neck, and face, and doesn't say what symptoms the descriptions refer to. Tr. 2493.

regions, no acute ischemia, and no focal intracranial abnormalities. Tr. 2394. "The possibility of demyelination" could not be ruled out. Tr. 2394.

In August 2019, Byrd's neurologist listed Byrd's headaches as assessed "problems," wrote that Byrd had "migraine [without aura]," started Byrd on Elavil, a headache prevention medication, and listed the headache medications that he had not yet tried, including Botox injections. Tr. 2620.

In October 2019, Byrd returned to his neurologist's office. Byrd's assessed problems included chronic daily headaches, which were described as tension-type headaches with a strong cervicogenic component and migraines without aura. Tr. 2681. The provider increased Byrd's Elavil and commented that Botox injections would likely be Byrd's "best next option." Tr. 2681. Byrd stated that he was hesitant about Botox injections because of the needles. Tr. 2681.

In December 2019, Byrd had a consultative exam with a clinical psychologist. Tr. 2788. Byrd reported that he had back and neck problems since 2010, when a barrel fell on his neck at work. Tr. 2790. Byrd stated that he experienced daily headaches since "a lumbar puncture procedure" in 2018. Tr. 2790.

A November 2020 treatment note indicates that Byrd had a Botox injection at some time prior to the visit. Tr. 3134–35.

5

### 3. *Hearing testimony*

Byrd, who was represented by counsel, testified at the telephonic administrative hearing held in December 2020. Byrd stated that he lives in a house with his mother and brother. Tr. 820. When asked whether he had problems using stairs, Byrd stated that he does—his knee, hips and back hurt. Tr. 820. He "gets headaches real bad." Tr. 820. Byrd also has problems driving. Tr. 822. When he drives, his knees and lower back hurt, sitting puts pressure on his neck, and his headaches worsen. Tr. 822–23.

When asked why he was unable to work, Byrd cited his back, headaches, knees, hips, and shoulders. Tr. 825. He has problems bending over. Tr. 825. All he wants to do is lie down. Tr. 825. His eyes get watery, things look blurry, and the right side of his head and neck hurt. Tr. 825.

Byrd sees a neurologist for his headaches. Tr. 826. The right side of his head hurts all the time. Tr. 826. He received his first Botox injection in November, the month before the administrative hearing, and he was scheduled to have his next injection in January. Tr. 826. Byrd hadn't noticed that the injection helped, but his provider told him that it might take 2 or 3 injections before Byrd notices any changes. Tr. 826–27. When asked how often he gets headaches, Byrd answered, "All the time. Usually when I'm talking, sitting and talking." Tr. 827.

When asked what makes his pain better or worse, Byrd explained that lying down in bed makes his pain better. Tr. 827. Bending over, reaching for

6

something, trying to read, and noise make it worse. Tr. 827. He can't stand noise and reading "black and white print" gives him headaches. Tr. 827. Sometimes Byrd gets lightheaded and dizzy. Tr. 827. Trying to "sit there and do more of it" makes it worse. Tr. 827. He can't stand long because of the pressure on his knees and neck. Tr. 827.

On a typical day, Byrd wakes up, watches television, and texts family and friends. Tr. 828. Byrd does some light cleaning and gardening, shops, plays with his dogs, goes fishing, and visits his friend once a month. Tr. 828. When asked if he could perform a job requiring him to sit and sort nuts and bolts, Byrd stated that he could not because "I would be standing there and it would bother my legs, my hips, and my neck. And, bending over." Tr. 832.

When asked if he has problems turning his head from side to side, Byrd answered, "All the time, even looking down." Tr. 832.

The ALJ discussed with the vocational expert Byrd's past relevant work as a recycling worker and parts laborer. Tr. 834–35. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Byrd could perform Byrd's past work or any other work if the individual had the limitations assessed in the ALJ's residual functional capacity (RFC) determination, described below.[4] Tr.

---

[4] An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

835–36. The vocational expert answered that such an individual could not perform Byrd's past work but could perform the following jobs: weight recorder, night cleaner, and locker room attendant. Tr. 836–37, 840.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since October 2, 2019, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spine with spondylosis; radiculopathy from the lumbar spine; cervicalgia; degenerative joint disease of the bilateral shoulders; prepatellar bursitis of the left knee; anxiety disorder; depressive disorder; alcohol use disorder in sustained remission; mild degenerative joint disease of the right knee; right hip bursitis; hallux valgus of the bilateral feet; impingement syndrome of the right shoulder; and obstructive sleep apnea. (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: he can occasionally climb ramps and stairs. He is limited to no climbing of ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel and crouch but never crawl. He is never to work around hazards, such as unprotected heights or moving dangerous mechanical parts. He can occasionally operate a motor vehicle. He can never operate foot controls with the bilateral lower extremities. He is to do no overhead reaching with the bilateral upper extremities. He can occasionally work outdoors in the weather, in conditions of humidity and wetness, and in conditions of extreme heat and extreme cold. He can frequently handle, finger and feel with the bilateral upper extremities. He can perform simple routine, and repetitive tasks, but not at a production rate pace (for example, no assembly line work). He is limited to simple work-related decisions. He can have occasional contact with supervisors, coworkers and the general public. He can tolerate few changes in the work setting, defined as

routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur infrequently and be adequately and easily explained. He is limited to a sit-stand option at the workstation each hour to change position for two minutes while remaining on task 92% of the workday. He is to have two additional bathroom breaks outside of the normal breaks of no more than 5 minutes each while remaining on task 92% of the workday. He is limited to no more than occasional exposure to concentrated dust, odors, fumes or other pulmonary irritants and is limited to no extreme heat or extreme cold. He is limited to no tandem work.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born [i]n April 1977 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 2, 2019, the date the application was filed (20 CFR 416.920(g)).

Tr. 14–29.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

9

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each

element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id*.

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*,

11

800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

Byrd argues that the ALJ erred when she determined that Byrd's headaches were not a "medically determinable impairment." Doc. 7, at 6.

At step two, an ALJ must evaluate whether a claimant has a "medically determinable impairment." *See* 20 C.F.R. § 416.921. A *medically determinable impairment* "results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source." *Id*. The impairment must also meet the durational requirement—"it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909. If the ALJ finds that the claimant has a *medically determinable impairment*, then the ALJ determines whether that impairment is severe or non-severe. 20 C.F.R. § 416.921. "Once one severe impairment is found, the combined effect of all impairments must be considered [in determining the claimant's residual functional capacity], even if other impairments would not be severe." *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009).

At step 2, the ALJ listed Byrd's "severe" impairments and his "non-severe" impairments. Tr. 14. The ALJ didn't mention Byrd's headaches. After determining whether a claimant has medically determinable impairments, the

ALJ must determine whether the claimant's impairments are severe. *See* 20 CFR 416.921. Since the ALJ didn't mention Byrd's headaches, she necessarily found that they were not medically determinable. The Commissioner resists this logic. She argues that it is "speculative" to assume that "because the ALJ did not find headaches to be a severe or non-severe impairment, [s]he could only have meant for them to be a non-medically determinable impairment." Doc. 8, at 7.

I'm not sure what to do with this argument. It is a fact that after determining whether a claimant has medically determinable impairments, the ALJ must determine whether the claimant's impairments are severe. 20 C.F.R. § 416.921. The ALJ didn't mention Byrd's headaches. The only conclusion that one could reach under the regulation is that the ALJ found that Byrd's headaches were not medically determinable. Logic, not speculation, dictates that result.

Moreover, the Commissioner doesn't explain what additional category of impairments she believes exist that aren't described in the regulations or state where in the ALJ's decision one might find the missing headache impairment. Her statement that an ALJ "can consider all of the evidence without directly addressing all of it," Doc. 8, at 7, is true. But it doesn't address Byrd's alleged error in this case.

Next, the Commissioner offers an argument that, she admits, is "also speculative." Doc. 8, at 7. She writes, "it is equally possible that the ALJ

13

intended to include headaches as a severe or non-severe impairment but inadvertently omitted reference to them at step two." *Id.* So then, the Commissioner's argument goes, I can evaluate Byrd's headache impairment *as if the ALJ had* found it to be a *medically determinable impairment* and perform a different kind of analysis, one that involves harmless error. *Id.* But the ALJ *didn't* find that Byrd's headaches were severe or non-severe, so I can't perform the harmless error analysis that the Commissioner describes. *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 808 (6th Cir. 2018) ("[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself, and not based on appellate counsel's post hoc rationalization[s]") (internal quotation marks and citations omitted).

For her third argument, the Commissioner states that, even if the ALJ did mean to find that Byrd's headaches were not a *medically determinable impairment*, substantial evidence supports the ALJ's decision. Doc. 8, at 7. The Commissioner submits that Byrd is "[e]ssentially … relying on his symptoms and diagnoses to argue that the record established a medically determinable headache impairment, which should fail because the regulation specifically states that a medically determinable impairment cannot be established by a diagnosis or symptoms alone." *Id.*

Byrd cites evidence in the record, however, showing that he was assessed with chronic, tension-type headaches. Doc. 7, at 3, 7; Tr. 2185; *see* Social Security Ruling 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019)

14

(describing how the Agency evaluates cases involving a "primary headache disorder," a *medically determinable impairment*, which includes "tension-type headaches").[5] Even the ALJ acknowledged Byrd's migraines at the administrative hearing. Tr. 818 ("[W]e definitely have migraines in the records"); SSR 19-4p, 2019 WL 4169635, at *2 (migraine headaches are a *primary headache disorder*). Byrd identifies evidence showing that his headaches lasted for more than 12 months.[6] Doc. 7, at 3, 7; *see* 20 C.F.R. § 416.909. He cites evidence in the record showing that he had various tests—an MRI, CTA scan—that ruled out other potential causes for his headaches.[7] Doc. 7, at 4; Tr. 2031, 2394; *see* SSR 19-4p, 2019 WL 4169635, at *4 ("To rule out other medical conditions that may result in [headache] symptoms, a physician may also conduct … imaging scans" like an MRI or CTA scan). Byrd

---

[5] Social Security Ruling 19-4p also explains that "secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection)" are not *medically determinable impairments* "because secondary headaches are symptoms of another underlying medical condition." 2019 WL 4169635, at *5. The ALJ did not include any findings in her decision indicating that she believed that Byrd's headaches were a *secondary*, not *primary*, headache disorder.

[6] *See, e.g.*, Tr. 1175 (August 2018, "Active Patient Problems … Chronic tension-type headache, intractable"); Tr. 1358 (November 2018); Tr. 1886 (January 2019); Tr. 2191 (May 2019); Tr. 2579 (August 2019); Tr. 3070 (January 2020).

[7] Byrd's MRI showed "the possibility of demyelination changes." Tr. 2394. Demyelinating diseases can cause neurological problems. *See* https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/expert-answers/demyelinating-disease/faq-20058521#:~:text=A%20demyelinating%20disease%20is%20any,even%20stop%2C%20causing%20neurological%20problems (last visited Dec. 21, 2022).

had Botox treatment for his headaches. Doc. 7, at 4; *see* SSR 19-4p, 2019 WL 4169635, at *6 ("Examples of medications used to treat *primary headache disorders* include, but are not limited to, botulinum neurotoxin (Botox®)…"). So Byrd is not just relying on his "symptoms and diagnoses," as the Commissioner alleges. And because the ALJ didn't discuss Byrd's headache impairment at step 2, I can't review whether substantial evidence supports the ALJ's finding that Byrd's headaches aren't a *medically determinable impairment*.

In a final attempt to salvage the ALJ's error, the Commissioner argues that the ALJ "referenced" Byrd's headaches in the section of her decision explaining her RFC assessment. Doc. 8, at 9. But while the ALJ cited Byrd's testimony in which Byrd complained of headaches, Tr. 19, some headache treatment notes from Byrd's neurologist, Tr. 21–22, and Byrd's complaints of headaches in the record, Tr. 22, 27, the ALJ didn't provide any conclusions about that evidence. I decline to adopt the Commissioner's post-hoc rationalizations and request to weigh the evidence myself. Doc. 8, at 9–10; *see Hicks*, 909 F.3d at 808 ("[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself, and not based on appellate counsel's post hoc rationalization[s]") (internal quotation marks and citations omitted). Moreover, the ALJ listed each impairment that served as the basis for each functional limitation in the RFC and did not list headaches. Tr. 26. The ALJ explained that "[t]he residual functional capacity set forth above fully

16

accommodates the claimant's severe medically determinable impairments," Tr. 26—not headaches. So the ALJ's RFC doesn't account for Byrd's headaches.

The ALJ erred when she failed to explain why she found that Byrd's headaches were not a *medically determinable impairment*.

**Conclusion**

For the reasons explained above, I recommend that the Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

Dated: December 22, 2022

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).